## Nelson (a mulatto)
### *v.*
## The People of the State of. Illinois.

1. Constitutional law — *of the act prohibiting the immigration of negroes into this State.* The act of February 12, 1853, to prevent the immigration of negroes and mulattoes into this State, is not in contravention of that provision of our State Constitution which declares that "there shall be neither slavery nor involuntary servitude in this State, except as a punishment for crime whereof the party shall have been duly convicted."

2. The sale of a negro or mulatto under that act does not reduce him to slavery. It is but a mode of punishment, not prohibited by the Constitution, for an act which the legislature have declared to be an offense. A State has the power to define offenses and prescribe the punishment; and the exercise of such powers cannot be inquired into by the courts. The case of *Eells* v. *The People*, 4 Scam. 498, upon this question, cited and approved.

3. Congress has the exclusive power to provide by law for carrying into effect the provisions of the Federal Constitution, requiring the return of fugitives from labor, and no State legislature has the power to adopt any measure which may hinder or obstruct the enforcement of the act of congress on that subject.

4. But the placing of a slave in the custody of one who may become a purchaser under the provisions of the act of 1853, does not hinder the execution of the fugitive slave law, as such custody is declared to be subject to that act of congress.

Nelson (a mulatto) *v.* The People.

5. Nor does the requirement that the owner shall pay all reasonable costs incurred in the apprehension and keeping of his slave.

6. But when it declares that he shall pay the remainder of the fine, it would seem that such a provision may obstruct or hinder the execution of the act of congress. In that regard it imposes terms, conditions and burthens additional and repugnant to that act.

7. Nor has the State legislature the power to prescribe a different tribunal, for the purpose of ascertaining whether the fugitive is a slave, from that provided by the act of congress.

8. Although the eighth section of the act of 1853, containing these provisions, may be repugnant to the act of congress, yet the remaining portions of the act, under which a negro may be proceeded against for committing the offense of coming into the State with an intention to reside therein, may be enforced, as they do not contravene any provision of the State or Federal Constitution, nor any act of congress.

9. CONSTITUTIONAL LAW — *where portions of an act are unconstitutional, and other portions unobjectionable.* If portions of an act are constitutional, and a portion is not, such portions as are free from the objection may be executed and enforced, whilst the obnoxious provisions will be disregarded.

WRIT OF ERROR to the Circuit Court of Adams county; the Hon. JOSEPH SIBLEY, Judge, presiding.

Nelson, a mulatto, was arrested under the act of February 12, 1853, prohibiting the immigration of negroes and mulattoes into this state.

The complaint, in pursuance of which the arrest was made, was entered before a justice of the peace in Hancock county, and alleged that " a tall, slim mulatto, about 55 years old, and called Nelson, on the 25th day of December, 1862, at Hancock county, came into this State and county, and remained ten days and more, with the evident intention of residing in said Hancock county." " That said mulatto person was not born in the State of Illinois, nor a resident thereof prior to 12 February, 1853, that he (the affiant) does not know whether he is a free person or slave, but that he is guilty of a misdemeanor under the law."

The trial before the justice resulted in a verdict of guilty, and a judgment assessing a fine of $50 upon the defendant, and directing that he be kept in the custody of the sheriff until the fine and costs be paid, or he be " otherwise disposed of according to law."

Nelson (a mulatto) *v.* The People.

The defendant took an appeal from that judgment to the Circuit Court of Hancock county, pending which the cause was removed, on change of venue, into the Circuit Court of Adams county.

A trial in the Circuit Court also resulted in a verdict and judgment against the defendant, and thereupon he sued out this writ of error. And he now insists that the judgment below is erroneous, by reason of the act under which the proceeding was had, being in contravention of the Constitution of this State and of the United States, and also of the act of congress, commonly known as the "fugitive slave law."

Messrs. GRIMSHAW & WILLIAMS, for the plaintiff in error.

Mr. J. B. WHITE, State's attorney, for the people.

Mr. CHIEF JUSTICE WALKER delivered the opinion of the court:

This was a prosecution under the act of the 12th of February, 1853, to prevent negroes and mulattoes emigrating into this State. The third section of the act declares, that if any negro or mulatto, bond or free, shall come into this State, and remain ten days, with the evident intention of residing in the same, such negro or mulatto shall be deemed guilty of a high misdemeanor, and for the first offense shall be fined the sum of fifty dollars, to be recovered before any justice of the peace of the county where such negro or mulatto shall be found. It also directs that the proceedings shall be in the name of the people, and a trial by a jury of twelve men.

The fourth section declares, that if such negro or mulatto shall be found guilty, and the fine assessed be not forthwith paid to the justice before whom the proceedings shall be had, it shall be the duty of the justice of the peace to commit the negro or mulatto to the custody of the sheriff, or otherwise keep him, her or them, in custody; and the justice of the peace is required forthwith to advertise the negro or mulatto, by posting up notices in at least three of the most public places in his district, for ten

days, and, on the day and at the place named in the notice, the justice shall, at public auction, proceed to sell such negro or mulatto to any person who will pay the fine and costs for the shortest period. And the power is conferred upon the purchaser to compel such negro or mulatto to work for and serve out the time, and he is required to furnish such negro or mulatto with comfortable food, clothing and lodging during the servitude.

This proceeding was had under these provisions, and resulted in a conviction of the accused and the entry of a fine. From the judgment of the justice of the peace an appeal was taken to the Circuit Court, where a trial was had, resulting in a conviction and the imposition of a fine; to reverse which, the cause is brought to this court. It is insisted, as a ground of reversal, that the law is repugnant to our State Constitution, the Constitution of the United States, and to the fugitive slave law. The sufficiency of the evidence to sustain the verdict is not questioned on the argument.

Article XIV of our Constitution declares, "that the general assembly shall, at its first session under the amended Constitution, pass such laws as will effectually prohibit free persons of color from emigrating to or settling in this State, and to prevent the owners of slaves from bringing them into the State for the purpose of setting them free." It is obvious that a portion of the provisions of this act are designed as a compliance with this constitutional requirement.

The Constitution having failed to specify the mode by which such persons shall be effectually prevented from emigrating to or settling within this State, it of necessity devolves upon the general assembly to choose such means as will attain the end. And in doing so, they must be held to be the sole judges as to the proper means to be employed. They have the discretion, subject to the control of neither of the other departments of government. The only limitation of their power is the Constitutions of the general and State governments. If not restricted by either of those instruments, their power has no limitation. And to determine that question, a resort must be had to the provisions of those fundamental laws.

It is first insisted that this enactment is violative of the 16th section of article XIII of our Constitution. It declares that "there shall be neither slavery nor involuntary servitude in this State, except as a punishment for crime whereof the party shall have been duly convicted." In the case of *Eells* v. *The People*, 4 Scam. 498, it was said, that a State has the power to define offenses and prescribe the punishment, and that the exercise on such powers cannot be inquired into by a court of justice. In the rightful exercise of this power, the legislature has declared the emigration of persons of color to, and their settlement in, this State as an offense, and has declared the punishment. The courts are not authorized to say that such an act is not a crime, or that the mode of punishing it is improper. Nor have they the right to determine that the best mode of enforcing this constitutional provision was by some other mode than by punishing the act as a crime.

Having declared it an offense, the punishment by involuntary servitude, provided by the act, is not unusual, but is one of the common means resorted to, to punish offenses, as the State penitentiary, and the various houses of correction in our State, fully attest. Our legislature, at an early period in our history, as have the legislative bodies in perhaps a majority of the States, declared that vagrancy in any of its citizens is a crime, punished by sale and involuntary servitude, in the same manner as the offense created by this statute. And we have yet to learn that the constitutionality of that law has ever been questioned. We have no hesitation in holding that the legislature were not prohibited by this clause of the Constitution from enforcing the provision prohibiting persons of color from coming to and settling in the State. This does not reduce the person convicted to slavery, but it is a mode of punishment not prohibited by the 16th section of article XIII of the Constitution.

Under this proceeding, the person convicted and sold is only reduced for a limited period to the condition of an apprentice. He is bound to the faithful service of his master during the period of his apprenticeship. The laws of all States of the Union authorize the relation of master and apprentice, and yet it has

not been regarded as involuntary servitude within the meaning of our Constitution and others with similar provisions. It may be said, however, that the relation of master and apprentice is based upon contract; but, until of a certain age, the apprentice has no power to enter into the agreement, which is made by another for him, and not at all times by a parent or even a guardian, as the power to act for the minor is conferred upon officers of the law. And yet the servitude, although involuntary in such cases, has never been, so far as we can learn, regarded as violative of this provision of the Constitution. In all of these cases, as well as those under this enactment, the master only has the right to the labor and service for a limited period.

We have seen that the legislature has declared that the emigration of such persons to and settlement in the State is declared to be an offense. And the statute has made ample provisions that it shall only be punished upon the party being duly convicted thereof. This is also in strict compliance with the Constitution. We are, for these reasons, unable to perceive that this enactment is in conflict with this section of the fundamental law.

It is again urged, that this enactment is in violation of the fourth article of the Constitution of the United States. It declares that " the citizens of each State shall be entitled to all privileges and immunities of citizens of the several States." In reference to this provision, it is only necessary to say that this record contains no evidence that the plaintiff in error is a citizen of any State. When that shall appear it will be time to discuss the question.

It is also insisted, that the provisions of this second section of the act apply to both bond and free persons of color, whilst article XIV of our Constitution refers alone to free persons of that description. In the case of *Eells* v. *The People*, it was held that the police power of the State embraces the authority over the whole of the internal affairs of the State, in its civil and criminal polity, and that it has the power to prevent the introduction of negro slaves into the State, and to punish those of its citizens who introduce them. It was likewise held that such a law was not in conflict with the third paragraph of sec-

tion 2 of article IV of the Constitution of the United States. That case was removed to the Supreme Court of the United States, where it was affirmed. If, then, the State may prohibit the introduction of slaves, and punish those who introduce them, it follows that the State may, by the exercise of the same power, prohibit the slaves from coming to or settling in the State, and if they violate the prohibition they may be punished therefor. The decision of the case of *Eells* v. *The People*, it is true, was made under the old Constitution, but the provisions of that instrument on this question were the same as the new one, except article XIV, which contains no provision prohibiting the exercise of the power. The provisions under consideration are only a reasonable police regulation, adopted for the protection of the inhabitants of the State against a class of persons which are supposed to be injurious to our community.

It is likewise insisted that the provisions of the 8th section of this act are in conflict with the act of congress, providing for the return of fugitives from justice and labor. That section declares that if after the arrest of such person, any person shall claim the negro or mulatto as a slave, the owner or his agent shall have the right, by giving reasonable notice to the officer or person having the custody of such negro or mulatto, to appear before the justice of the peace, before whom such negro or mulatto had been arrested, and may there prove his or her right to the custody of such person as a slave, and if the justice of the peace shall, from the evidence, be satisfied that the claimant is · entitled to the same, in accordance with the laws of the United States passed upon the subject, he shall, upon the owner or agent paying all costs up to the time of claiming such negro or mulatto, and the costs of proving the same, and also any balance of the fine remaining unpaid, give to the owner or agent a certificate of such facts, and the owner or agent shall have the right to remove such slave out of the State. These provisions, it is claimed, hinder and delay the execution of the fugitive slave law, and operate as an obstruction to the assertion of the rights of the owner.

It has been held that congress has the exclusive right to pro-

vide, by enactment, for carrying into effect the provisions of the national Constitution, requiring the return of fugitives from justice and labor. And it has likewise been held that State legislatures have no power to adopt any measure which may hinder or obstruct the enforcement of the act of congress on that subject. Then does this provision have that effect? The placing the slave in the custody of the purchaser for the limited period, does not, as the custody is declared to be subject to the act of congress. Nor does the requirement that the owner shall pay all reasonable costs incurred in the apprehension and keeping of his slave. But when it declares that he shall pay the remainder of the fine, it would seem that such a provision may obstruct or hinder the execution of the act of congress. It imposes terms, conditions and burthens, additional and repugnant to that act. Nor have the general assembly the power to prescribe a different tribunal for the purpose of ascertaining whether the fugitive is a slave, from that created by congress.

But if these provisions are violative of the act of congress, the question does not arise in this case. When the master shall apply for his slave the question will arise, but he has not, so far as this record discloses, made such an application. Although the eighth section of the act under consideration may be repugnant to the act of congress, still, the remaining portions of the law, not subject to the objection, and not violative of the national or State Constitutions, may be enforced. If portions of an act are constitutional, and a portion is not, such parts as are free from the objection may be executed and enforced, whilst the obnoxious provisions will be disregarded. The provisions under which these proceedings were had, violate no provision of the State or national Constitutions, or any enactment of congress, and they warranted the judgment of the court below.

The fourteenth article of the Constitution, was separately submitted to the people for adoption or rejection. After a full consideration of its provisions, the voters of the State sanctioned it by a majority of many thousand. Having thus become a part of the fundamental law of the State, the members of the general assembly, under their oaths to support that instrument, had no

choice but to give effect to its provisions, and when they have done so, it is for the courts to enforce the enactment according to its spirit, unless prohibited by the Constitution itself. If the provisions of the law are not deemed, by the people, the best calculated to attain the end, it is with them, through their representatives to make the change. Or if the constitutional provision itself is deemed wrong, the people have the means of repealing or amending the article. But so long as it is a part of the fundamental law of the State, it must be enforced according to its spirit and true meaning. The judgment of the court below must be affirmed.

*Judgment affirmed.*

Mr. JUSTICE BECKWITH dissenting.